IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DOUGLAS R. SCHRADER,

    Plaintiff,

v.                                          Civil Action No. 3:12-cv-54

MICHAEL ASTRUE,
Commissioner of Social Security,

    Defendant.

**REPORT AND RECOMMENDATION THAT MR. SCHRADER'S
MOTION FOR SUMMARY JUDGMENT BE DENIED AND COMMISSIONER'S
MOTION FOR SUMMARY JUDGMENT BE GRANTED**

**I. INTRODUCTION**

**A. Background**

Douglas R. Schrader brought this action under 42 U.S.C. § 1383(c) for judicial for review of the decision of the Commissioner of Social Security that denied his claims for supplemental security income (SSI) under Title XVI, 42 U.S.C. §§ 1381-1383f.[1] Commissioner filed his Answer on August 7, 2012.[2] Mr. Schrader filed his Motion for Summary Judgment on September 28, 2012.[3] Commissioner filed his Motion for Summary Judgment on November 28, 2012.[4]

**B. The Pleadings**

    1. Mr. Schrader's Motion for Summary Judgment.

    2. Commissioner's Motion for Summary Judgment & Memorandum in Support.

---

[1] Dkt. No. 1.

[2] Dkt. No. 7.

[3] Dkt. No. 11.

[4] Dkt. No. 15.

**C. Recommendation**

I recommend that:

1. Mr. Schrader's Motion for Summary Judgment be **DENIED** because: (1) Hallex does not impose a judicially enforceable duty, and the Commissioner's actions do not violate the Administrative Procedures Act; (2) the VE testified consistent with the manuals; and (3) the hypothetical was proper.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. FACTS

**A. Procedural History**

Mr. Schrader applied for SSI on February 29, 2008, alleging disability as of October 11, 2003, due to pain in his neck and back, poor hearing, and poor spelling.[5] The Social Security Administration denied the application in the first instance and on reconsideration. At Mr. Schrader's request, an ALJ held a hearing on March 17, 2010, at which Mr. Schrader, who was represented by counsel, and a vocational expert testified. On April 22, 2010, the ALJ issued a decision finding that Mr. Schrader was not disabled under the Act. The Appeals Council denied review on April 19, 2012, and Mr. Schrader timely filed the instant action against the Commissioner.

**B. Personal History**

Mr. Schrader was born on December 2, 1960, and was forty-nine years old at the time of the hearing. During his schooling, Mr. Schrader attended special education classes and was held back

---

[5] This is Mr. Schrader's third application for disability benefits. The first two were denied and never appealed to federal court, and the last unfavorable decision is from April 2007.

on multiple occasions. Eventually, in the eighth grade, he dropped out of school and never received a diploma equivalent. Mr. Schrader lost his father to suicide, and his mother to cancer, and has several surviving siblings. He is married, and has been for over twenty years, and has two children from the marriage. There is one grandchild that lives with Mr. Schrader, whom he and his wife take care of. His occupational history is limited, with only a job as a laborer for a lumber company showing up in the records before the Court.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Mr. Schrader is not under a disability and can still perform work in the national economy:

*1. Physical Health*

Throughout the medical history, Mr. Schrader regularly sees a licensed physician's assistant as his primary provider. The provider's impressions remain relatively constant throughout the record, with low back pain, neck pain, and hypertension diagnoses appearing on nearly every report. (*See* R. 506-38.) Mr. Schrader has also been treated, and is receiving treatment for asthma. (R. 681.) The treating physician maintained pain medication, and medication for his hypertension and asthma, and recommended that Mr. Schrader "stay as active as possible." (*See e.g.* R. 507, 576.) On several occasions Mr. Schrader appeared perturbed with his treating physician for not increasing his medication in milligram or quantity. (R. 587, 618.) Mr. Schrader has also presented to the emergency room several times with reports of pain in his back.

A radiologist report from January 2007 examining Mr. Schrader's spine showed "no radiographic evidence of bone or joint abnormality." (R. 356.) An MRI performed the same day

gave the radiologist the impression that Mr. Scrader has "mild degenerative disc disease at L4-5 and L5-S1 with disc dehydration and posterior diffuse disc bulging . . . moderate spinal stenosis at L5-S1 . . . [and a] Tarlov Cyst at S2-S3." (R. 384.) A report done one month later showed "reversal of normal cervical lordosis with narrowing at C3-4," and a "slightly atypical alignment of CI and the base of the skull which is thought to be positional in nature." (R. 357.) That report recommended a CT scan to rule out any abnormalities in the base of the skull through C3. (*Id*.) In February 2008, a physician concluded that Mr. Schrader could not perform laborious jobs because of his back pain. (R. 574.)

On May 17, 2008, the West Virginia Disability Determination Service conducted a physical assessment of Mr. Schrader, who appeared at the appointment "[w]ell developed, well-nourished, [and] alert and oriented to time, place and person." (R. 398.) That report went on to state that Mr. Schrader walked with a normal gait with no aids, was able to hear and understand conversational voices spoken at normal tones, and had normal vision. (*Id*.) With regard to Mr. Schrader's neck and back, the doctor found the spine curvature normal, no tenderness, spasm, or rigidity, and that the range of motion for the cervical spine allows 60 degrees of flexion and 75 degrees of extension. Based upon his review of Mr. Schrader and his medical records, the doctor concluded that Mr. Schrader has hypertension, bronchial asthma, chronic neck an lumbar spine pain, and degenerative arthritis of the cervical and lumbar spine. (R. 400.) A physical residual functional capacity assessment performed on June 12, 2008, concluded that Mr. Schrader could perform light work with some postural and environmental limitations. (R. 408.)

An MRI of the L Spine conducted in late December 2008 showed minimal disk bulging at the L4-5 level, and mild disk herniation at the L5-S1 level. The latter extends into the foramen on

4

the left, but does not cause significant nerve root compression. (R. 504.) The conclusion by the examining radiologist was that Mr. Schrader has minor degenerative disc disease without significant neural compromise. (*Id*.) An MRI of the C Spine was also conducted on the same day, which showed a reversal of the normal upper cervical lordosis, mild spondylolisthesis and disk bulging at the C3-C4 level, a tiny herniation at the C4-C5 level, and mild retrolisthesis and posterior marginal osteophyte formation at the C5-C6 level. (R. 505.) The examining radiologist concluded that Mr. Schrader has cervical spondylosis with cord flattening and mild foraminal narrowing. (*Id*.)

In a questionnaire from Disability Determination Services done in December 2009, Mr. Schrader's treating physician indicated that he could perform light work involving a significant amount of walking and standing, and lifting up to twenty pounds occasionally and ten pounds frequently. (R. 459.) The treating physician did include some limitations, however, including a need for a sit or stand option, and postural restrictions on climbing, balancing, stooping, bending, kneeling, crouching, crawling, squatting, and overhead reaching. (*Id*.) Moreover, the treating physician included environmental restrictions on jarring or vibrations, excessive humidity, temperature extremes, fumes, dust, noise, and environmental hazards. (*Id*.). Finally, the report added that Mr. Schrader would need to elevate his feet occasionally on the job, and would need to be absent more than twice per month. (R. 495.).

In May 2010, an MRI of the C Spine showed multilevel degenerative disc disease, posterior and anterior subluxations. (R. 585.) The doctor's impression was that the reversal of normal cervical lordosis may be due to degenerative change. (R. 586.) Another MRI of the C Spine done that same month but by a different clinic showed severe degenerative change with degenerative disc disease, scoliosis and reversal of the normal spine curve, disc herniation, and posterior subluxation. (R. 722.)

5

An L Spine MRI done in July 2010 showed mild degenerative disc disease and root sleeve diverticula within the sacral canal. (R. 640.)

On September 10, 2010, a neurologist found that Mr. Schrader was not a candidate for surgery at that time, and, instead, recommended pain management. A report from a pain management clinic dated September 14, 2010, assessed Mr. Schrader with generalized body pain secondary to myofascial pain syndrone, neck pain from spinal stenosis, and back pain from a disc bulge. (R. 645.) Mr. Schrader received muscle trigger point injections and was recommended to do home exercise. (*Id.*) In December 2010, Mr. Schrader underwent heart catheterization. (R. 693.)

*2. Mental Health*

On July 7, 2008, the West Virginia Disability Determination Service conducted a mental assessment of Mr. Schrader. At the assessment, Mr. Schrader was cooperative and compliant, maintained good eye contact, and was spontaneous in his actions. The length and depth of his verbal responses to questioning were "mildly deficient, but appropriate for his level of intellect." (R. 411.) Mr. Schrader's speech was relevant and coherent, but at a mildly slow pace, and he was oriented to time, name, and place, but not date. (*Id.*) Mr. Schrader's immediate and remote recall was within normal limits, but his recent recall was moderately deficient. (*Id.*) Finally, Mr. Schrader's concentration was within normal limits, and he produced a scaled score of 9 on the Digit Span subtest of the WAIS-III. (*Id.*) Based on these tests, and the doctor's objective observations, he concluded that Mr. Schrader suffered from alcohol dependance and borderline intellectual functioning. (R. 412.) A mental residual functional capacity report concluded that, based upon this and other reports, Mr. Schrader is capable of operating in "routine, low stress, work-like situations that require only two to three step operations as well as minimal production quotas." (R. 431.)

On January 9, 2010, Mr. Schrader's counsel referred him for a psychological evaluation. At this appointment, Mr. Schrader's cognitive functioning was measured within the borderline range and his achievement scores, including a Full Scale IQ score of 77, were comparable to his ability level. (R. 469-70, 473.) The assessing psychologist further stated that his depressive symptoms were in the moderate range and his anxiety symptoms in the severe range. (R. 473.) The psychologist recommended that Mr. Schrader undergo mental health counseling to address these symptoms, and pain management to help him cope with his chronic pain. (*Id.*) On June 23, 2010, a neurosurgeon described Mr. Schrader's mental status as having: "higher integrative functions of orientation to time, person, and place, recent and remote memory, attention span and concentration, language and fund of knowledge were all normal." (R. 606.)

**D. Testimonial Evidence**

Testimony was taken at the hearing held on March 17, 2010. The following portions of the testimony are relevant to the disposition of the case:

Mr. Schrader testified that he is having problems with the discs in his neck and low back, and that he suffers from breathing problems and high blood pressure. (R. 50.) He further testified that he was not receiving any treatment for mental health issues, and that he has not been hospitalized since the last hearing in 2007. (R. 51-52.) Mr. Schrader testified that the pain from his neck and back extends into his shoulders, arms, and legs, and that he is taking several medications for the pain. (R. 52.) Over the year preceding the hearing, Mr. Schrader claimed that he had cut down on his alcohol consumption to three to four beers, two to three days a week. (R. 52-53.) Mr. Schrader claimed that he can only walk about 150 feet without stopping, and can stand for 15-20 minutes if its on carpet or soft ground. (R. 55, 75.) He claimed that he quit cutting firewood the

7

winter preceding the hearing, but still carries the store bought logs to put in the stove. (R. 56.) He does not smoke, wear glasses or hearing aids, and claims to get roughly three to four hours of sleep a night. (R. 56.) Mr. Schrader does not hunt, fish, or garden anymore like he used to, and that his day consists of hanging out around the house and watching television. (R. 57-59.)

Upon examination by his attorney, Mr. Schrader reiterated that he has had to give up all the things that he used to do, and that the pain in his neck causes everything to get blurry and go black. (R. 68.) He further stated that it was hard to look in any direction, and that he only drives a couple times a week because of this problem. (R. 69-70). Further, Mr. Schrader stated that he has trouble raising his arms and gripping items, that he has tingling in his fingers, and that he has bursitis in both elbows. (R. 72-74.)

The ALJ then posed the following hypothetical, his prior hypothetical, to the vocational expert:

> The profile is 48 to 49 . . . he has a limited education at the seventh grade. He functions at the borderline level of intellectual ability. Consider my prior hypothetical as light. Light work is lifting 20 pounds occasionally, 10 pounds frequently; standing and walking six hours out of an eight-hour day; sitting six hours out of an eight-hour day; all the postural activities at occasional; avoid concentrated exposure to temperature extremes, fumes, dust, odors, gases; and the hazards of moving plant machinery and unprotected heights. Furthermore, limited to unskilled one or two-step type tasks or work activity, simple, routine, repetitive. Based upon that hypothetical, the prior vocational expert determined that there were jobs that were available. Do you agree as to whether or not, if an individual is limited as I've described, there would be jobs in the national or regional economy?

(R. 80-81.) The VE testified that there would be jobs. The ALJ then changed the hypothetical as follows:

> I want to change the hypothetical to having the ability to change

> positions at the workstation ten minutes on each hour. And I want to limit the work overhead, no overhead reaching. But the rest of the hypothetical would involve no climbing of any ladders, ropes or scaffolds; only occasionally use ramps, steps, balance, stoop, kneel, crouch or crawl. The environmentals would stay essentially the same. Avoid a concentrated exposure to the temperature extremes of heat and cold; concentrated exposure to fumes, dust, odors, gases and pollutants; concentrated exposure to any hazards in working around moving plant machinery or heights that are not protected; and only simple, routine, unskilled work involving one or two steps. Now, based upon your training and your knowledge of the regulations, would there be jobs in the national or regional economy that would accommodate the light exertional level with the opportunity to change positions as I've indicated and the other factors that I modified the previous hypothetical with?

(R. 81-82.) The VE identified two light jobs that fit this hypothetical, laundry folder and locker room attendant, and two sedentary jobs that fit this hypothetical, general sorter and machine tender. (R. 82.)

The ALJ then queried into the drug and alcohol effects, asking the VE if the hypothetical person's alcohol use made that person off task for a third to two-thirds of the day, and resulted in absences of more than two a month, would there still be jobs in the national or regional economy. The VE responded in the negative. (R. 82.) The ALJ then posed the same scenario absent any alcohol or drugs, and if any jobs would be available. Again the VE responded in the negative. (R. 82.) Finally, the ALJ asked if the hypothetical person would only be able to stand and walk three hours out of an eight hour day, sit for three hours of that day, and be absent more than twice a month, if that would preclude work activity. Again, the VE responded that there would be no jobs even at the light or sedentary level. (R. 83.) Mr. Schrader's counsel briefly questioned the VE, posing hypotheticals which eliminated all competitive work. (R. 84-86.)

**E. Lifestyle Evidence**

The following evidence concerning Mr. Schrader's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Mr. Schrader's alleged impairments affect his daily life. Mr. Schrader typically wakes at 9 a.m. and has coffee and breakfast. He spends most of his days at home, where he watches television and piddles in his two small gardens. Mr. Schrader used to operate a weed eater and split firewood, but claims that he is no longer able to do those tasks. He is capable of maintaining his hygiene, shopping, fishing, and hunting. He has a history of alcohol and illicit drug abuse.

### III. THE MOTIONS FOR SUMMARY JUDGMENT

**A. Contentions of the Parties**

Mr. Schrader contends that there were several errors: first, he claims that the Commissioner violated his due process rights by assigning the case to ALJ Mills out of rotation; second, he contends that the vocational expert testified inconsistently with the DOT and SCO, without any explanation, and the ALJ's reliance on this testimony is in error; finally, Mr. Schrader argues that the ALJ posed an incomplete and inaccurate hypothetical to the VE.

The Commissioner, on the other hand, contends that there was no due process violation, no error in the VE's testimony, and that the hypothetical posed to the VE was proper.

**B. The Standards**

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The

party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*2. Judicial Review*

Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

*3. Social Security - Medically Determinable Impairment - Burden.*

Mr. Schrader bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

11

## C. DISCUSSION

*1. The ALJ did not commit reversible error by failing to assign a different ALJ, or recuse himself from hearing the case.*

Mr. Schrader argues that the ALJ that conducted the hearing and delivered the unfavorable decision that is the subject of the instant action is the same ALJ that conducted his prior hearing that resulted in an unfavorable decision, and that this constitutes a departure from agency procedure and is a violation of due process. In support of his argument, Mr. Schrader cites § 3105 of the Administrative Procedure Act, which states that ALJs "shall be assigned to cases in rotation so far as practicable." Further, Mr. Schrader cites a rotational rule from the Hearings, Appeals, and Litigation Law Manual (HALLEX), which provides that the "HOCALJ [Hearing Office Chief Administrative Law Judge] generally assigns cases to ALJs from the master docket on a rotational basis . . . unless there is a special situation which requires a change in the order in which a case is assigned." HALLEX I-2-1-55.

Mr. Schrader's argument is unavailing for several reasons. First, HALLEX is "an internal Social Security Administration policy manual . . . [that] does not impose judicially enforceable duties on either the ALJ or [the] court." *Lockwood v. Comm'r SSA*, 616 F.3d 1068, 1072 (9th Cir. 2010), *cert. denied by Lockwood v. Astrue*, 131 S. Ct. 2882 (2011); *see also Allen v. Astrue*, No. 5:09cv81, 2010 U.S. Dist. LEXIS 53298, *15 (N.D.W.V. May 28, 2010) (finding same). Because HALLEX is an agency interpretation that lacks the force of law, this Court cannot force the Commissioner to follow it or provide a remedy to an claimant who avers that the Commissioner did not follow it.

Moreover, HALLEX does not require recusal of an ALJ from hearing separate claims by the same person HALLEX I-2-1-60 provides that an ALJ "*may* disqualify himself from adjudicating a

case if the ALJ believes that his or her participation in the case would give an appearance of impropriety,"[6] and that "[i]f an ALJ refuses at the hearing to disqualify himself or herself, the ALJ's explanation in the transcript will be sufficient notice to the claimant." (emphasis added). Here, Mr. Schrader raised his objections to ALJ Mills hearing the successive claim, stating that the objection was "procedural only," and the ALJ stated that there was no cherry picking involved, and that he had no control over the way cases were referred. The ALJ further stated that it was that office policy that if a subsequently filed case comes before the same ALJ then that ALJ is "not precluded, and would not be released from reviewing it," and that he would decide the case on the evidence and testimony of Mr. Schrader. (R. 38-39.) Mr. Schrader has failed to prove that he was prejudiced by not getting a different ALJ and that the outcome would have been different, and did not even raise any notions of prejudice or bias in his motion to the ALJ, or in the colloquy with the judge.

Second, § 3105 of the Administrative Procedures Act does not require a different result. The Supreme Court has held that the "so far as practicable " language in the APA "allows assignments to be determined by more than just the mere mechanical rotation of giving the next case on the docket to the top name on the list of available examiners." *Sykes v. Bowen*, 854 F.2d 284, 288 (8th Cir. 1988) (citing *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 139 (1953)). Factors that are considered in determining any impropriety in going outside the rotation are the complexity of the case, the ability of the ALJ, and any bias that would prevent a fair hearing. *AAACON Auto Transport, Inc., v. I.C.C.*, 792 F.2d 1156, 1163 (D.C. Cir. 1986), *cert. denied*, 481 U.S. 1048 (1987). Mr. Schrader has not alleged any bias, or that the ALJ was not competent to hear

---

[6]An ALJ *must* recuse herself if the ALJ is prejudiced or partial with respect to the claimant. HALLEX, 1-1-1-60 C

13

his claim for benefits. Again, Mr. Schrader's counsel stated at the hearing that he was objecting solely on procedural grounds. (R. 38-39.) The APA does not allow such a challenge.

Finally, Mr. Schrader advances some other intra-agency materials to show how the Commissioner has treated episodes of preselection, and handled regional offices that have disregarded the rotational policy in the past. While the Court will reiterate that these, like HALLEX, are agency statements that do not carry force of law, it is important to note that Mr. Schrader has not presented any evidence that the rotational policy is not being followed, or that ALJ Mills preselected himself to hear the case. Quite the opposite, ALJ Mills stated that he had no control over the decision of which ALJ gets selected for which case, and that it was the office policy that just because an ALJ hears a successive claim, it does not bar her from hearing that claim if there is no bias or impropriety in the decision making process. (R. 38-39.) It could very well be that ALJ Mills was next on the list when Mr. Schrader's case was placed on his docket, and he has not shown any evidence to the contrary.

*2. The vocational expert testified consistent with the manuals.*

Mr. Schrader contends that the vocational expert testified inconsistently with the manuals without any explanation of that inconsistency, and that this is a violation of SSR 00-4p. His argument is that the ALJ's RFC to the vocation expert limited Mr. Schrader to "simple, routine, unskilled work involving 1 or 2 steps," and that all of the jobs of machine tender and locker room attendant require level two reasoning, in contradiction with the ALJ's requirement of a one to two step limitation. Further, he argues that the job of laundry folder would require exposure to extreme heat, and that this is contradictory with the RFC's limitation on "concentrated exposure," and similarly, that the job of general sorter listed is really the job of acetone button paster, which would

14

expose Mr. Schrader to the fumes of acetone.

Social Security Ruling 00-4p clarifies 20 C.F.R. § 404.1566, which provides that ALJs will consider both the Dictionary of Occupational Titles and the testimony of a vocational expert. Ruling 00-4p goes a little further to provided that if "there is an apparent unresolved conflict between [the two sources], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [VE's] evidence to support a determination or decision about whether the claimant is disabled." Specifically, the ALJ "will inquire, on the record, as to whether or not there is such consistency."

What Ruling 00-4p does not do is place an affirmative duty to "conduct an independent investigation into the testimony of witnesses," and if the claimant does not bring any inconsistencies to the ALJ's attention, "the ALJ [does] not need to explain how the conflict was resolved." *Boggs v. Astrue*, 2012 U.S. Dist. LEXIS 162080, *19 (N.D.W.V. Nov. 13, 2012); *see also Fisher v. Barnhart*, 181 Fed. Appx. 359, 366-67 (4th Cir. 2006) (unpublished); *Martin v. Comm'r Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006). Here, the ALJ asked the VE if his testimony was consistent with the Dictionary of Occupational Titles. The ALJ stated that it was. That is all SSR 00-4p requires.

Moreover, the argument advanced by Mr. Schrader, that level two reasoning is inconsistent with one to two step ability, has been rejected.[7] *See e.g. Money v. Barnhart*, 91 Fed. App'x. 210, 214-15 (3d. Cir. 2004) (finding that the levels included in the Dictionary are ceilings, and that the vocational expert's expertise is relied upon to determine the actual level of functioning required for

---

[7] Because the Social Security Act requires only one job to exist in the national economy in significant numbers to find that a person is not under a disability, the Court need not address the argument about the alleged environmental inconsistencies. *See* 20 CFR 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.").

those jobs). Here, the vocational expert concluded, based upon the hypothetical RFC proffered by the ALJ, that Mr. Schrader could perform any of the jobs listed, and that his testimony was consistent with the Dictionary. That is all that is required.

*3. The ALJ's Hypothetical Was Proper*

Mr. Schrader's final argument is that the ALJ did not include a limitation in his RFC that he would have to be employed under close supervision based upon his IQ of 77. In support, Mr. Schrader cites Social Security Ruling 85-16, which provides:

> The evaluation of intellectual functioning by a program physician, psychologist, ALJ, or AC member provides information necessary to determine the individual's ability to understand, to remember instructions, and to carry out instructions. Thus, an individual, in whom the only finding in intellectual testing is an IQ between 60 and 69, is ordinarily expected to be able to understand simple oral instructions and to be able to carry out these instructions under somewhat closer supervision than required of an individual with a higher IQ. Similarly, an individual who has an IQ between 70 and 79 should *ordinarily* be able to carry out these instructions under somewhat less close supervision.

(emphasis added). However, Ruling 85-16 does not require limitations of close supervision for all claimants with an IQ between 70 and 79. *See e.g. Norah v. Comm'r Soc. Sec.*, 2012 U.S. Dist. LEXIS 37634 (S.D. Oh. Mar. 20, 2012) (finding no requirement for close supervision in the ruling, and concluding that exclusion of close supervision from RFC of an individual with an IQ under 70 was within the zone of an ALJ's discretion); *Gonzales v. Astrue*, 2012 U.S. Dist. LEXIS 28264 (N.D. Oh. Mar. 5, 2012) (finding same with claimant having IQ of 72). Here, the ALJ weighed the evidence and concluded that a limitation of close supervision was not necessitated by that evidence. Moreover, just because Mr. Schrader's attorney posed further restrictions in her hypothetical to the VE does not mean that an ALF has to accept those further restrictions. *See. France v. Apfel*, 87 F.

Supp. 2d 484, 490 (D. Md. 2000). Here, the ALJ's hypothetical is the one relied upon, and it is proper under the law.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned recommends that:

1. Mr. Schrader's Motion for Summary Judgment be **DENIED** because: (1) Hallex does not impose a judicially enforceable duty; (2) the VE testified consistent with the manuals; and (3) the ALJ's hypothetical was proper.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: December 13, 2012                    /s/ *James E. Seibert*
                                            JAMES E. SEIBERT
                                            UNITED STATES MAGISTRATE JUDGE